Court is case number 181997, Sycamore IP Holdings v. AT&T Corp, appeal from a judgment from the Eastern District of Texas. Mr. Hughes, you want three minutes for rebuttal? Well, you know, I've made a game time decision to switch that, to try to switch that to four. That's fine. Okay. We'll switch it to four. Thank you, Your Honor. The first issue on this appeal is a straightforward claim construction dispute. The District Court narrowly construed the term and coded information stream, imposing a physical contiguity limitation of the claim transcoding scheme that is contrary to the specification and the technological field of the invention. Turning to the specification, column six is the only portion of the specification that mentions physical contiguity, and it expressly teaches that it is not required. It states at lines 20 through 22, it is not necessary to have these fields be physically contiguous within the encoded information stream as long as the fields can be found according to predetermined logic. The District Court determined that this language did not resolve the claim construction dispute because it's admittedly talking about fields within a given encoded information stream and not about whether the fields of an encoded information stream can be separated. But the District Court misses the point. The specifications teaching demonstrates that in this particular field, it is logical relationships that are paramount, not the physical ordering of the bits. And that is why in column six and elsewhere, the patent teaches that predetermined logical orders are what matter. And the purpose of the invention and the technological field further demonstrate that the reason that logical relationships are what matter here. The invention is a transcoding scheme that results in compression while preserving all the information in the incoming information groups. What matters to achieving the compression and the transcoding is the elegance of the disclosed invention. Control codes, location pointers, transition indicators, all of this encoding exists in a world of logical relationships. It has nothing to do with the physical arrangements of the bits. Are you criticizing the District Court for going beyond the base of the patent and the specification? The District Court made an express finding that ESPEC didn't answer that question. Yes, the specification does resolve the claim construction issue in Sycamore's favor because it teaches about the primacy of logical relationships. It expressly rejects the requirement of physical contiguity and the overall field of the invention transcoding is a field about logical relationships, which is why a person of ordinary skill in the art looking at figures 3A and 3B and looking at figure six would view those as a depiction of the logical representation of the transcoding scheme and not some requirement for the physical orientation of the bits. Is the District Court correct in saying that that passage in the specification doesn't really answer the question because it talks about sequences within the encoded information stream? The District Court is correct insofar as it goes that that's what the passage is talking about. But the nature of the invention, including that passage, teach about the primacy of logical relationships and the physical contiguity is not required, which is why a person of ordinary skill looking at figure six would not view that as depicting the physical arrangements of the bits, just like when the District Court looked at figure 8-2 in the accused specification, which is admittedly based on figure six. It has all the same fields, all the same bits, a little bit of rearranging, but that's not relevant to any issue here. The District Court concluded that that table, which is virtually identical to figure six, was a logical representation, which is exactly how somebody of ordinary skill in the art would view both 8-2 and figure six. So in our view, you need only look at the specification to resolve the issue. The District Court's treatment of 8-2 kind of proves our point. But if you get beyond the specification, as the District Court did, I still think we're in good shape. The dictionary definitions that the District Court relied on generally have the common concept that a stream is something that is continuous. But the problem with the District Court's reliance on the dictionary definitions is that the definitions are just of the word stream, whereas the disputed claim term is encoded information stream. And I think this court has to make the determination of whether those definitions even apply in a world where we're construing a modified term, not stream in isolation. And the reason that difference is significant here is that all of those definitions talk about a continuous flow of bits, whereas here the encoded information stream that we're construing in the patent is a finite series of bits that relates to an incoming information group. Everyone concedes it's... But the court pointed out that the patent makes clear that those bits are combined to make the encoded information stream, right? Yes, that is correct. But that, of course, begs the question of whether the combination is a logical combination or a physical combination, which turns us to the declaration of Dr. They said it's combined. It's easier to give combined its normal meaning if you assume the continuity or you assume that they're contiguous. I think that the meeting, the construction of combined that the district court used, which is to bring in the close relationship, really does just beg the question is what does that mean in a transcoding scheme? Does that mean to bring in a close relationship through logical relationships or does it mean some kind of physical continuity? And here I think the unrebutted declaration of Dr. Nettles shed some light on this question, because what he explained and nobody disputes because this is how it works when you're going through the transcoding in the real world, like in the adoption of the standard, what you've got is you create the transcoding. Then that goes into a superblock and that goes into a frame and that all gets scrambled and sent across the wire. But what's maintained that entire time are the logical relationships that are depicted in figure six or figure eight dash two in the standard. That's the only way that the invention or the standard can actually work, which is why in this technological field you look to the logical relationships that have primacy. Did you present any evidence that no one practices the standard in the way that the district court construed it? We'll turn now to that issue, Your Honor. The evidence that the error that the district court made on the summary judgment issue was resolving factual disputes against the non-moving party and effectively took the Fujitsu standard to suggest that at summary judgment there can't be any dispute about whether it would be possible to practice the standard without infringing. What we did is present evidence that practicing the standard necessarily infringes the patent because it requires the creation of figure eight dash two, which everyone... Did you offer any testimony from those who do practice the standard to say that you really can't do it any other way? What we relied on, we did not offer testimony from anyone, Your Honor. What we relied on is the standard itself, figure eight dash two, and then we relied on white papers written by the primary author of the standard, Stephen Gorsha, and then we also submitted some vendor documents. But I'd like to point the court's attention to the standard itself, which resolves the issue that there is at a minimum a fact dispute about whether practicing the standard always involves practicing one of the asserted claims of Sycamore's patent. If we look at page 375 of the appendix, and this is the portion of the G7041 that we cite in the brief, and this is talking about the implementation of the accused standard. It says, as depicted in the functional model in figure two, the first step in the client adaption process is decoding the physical layer of the client signal. It goes on to explain the decoded 8B10B characters are then mapped into a 64-bit, 65-bit, 64B65B block code. The structure of the 64B65B block code is shown in figure 8-2. So that is the standard itself saying that 8-2 is actually mapped. It's turned into code, which is sufficient for us to least generate a fact dispute. But there was evidence that you could practice the standard in a different way. If you're referring to the musings of the cited expert testimony from the Appellee's experts, that testimony, you can see that the quoted portions, even in the Appellee's brief, is just talking about it's theoretically possible to achieve the superblock. Well, didn't Dr. Nettle say it was also theoretically possible? I think all the experts agree that it's theoretically possible to create the superblock without first creating 8-2, but that is not the question. The question is whether practicing the standard as defined in the actual document of the standard requires the creation of 8-2. And the standard document itself says that it does, and that is alone sufficient to generate the fact dispute. The fact that it might be theoretically possible to create something in the standard in a non-standard compliant way, which is what the experts are talking about, really doesn't go to the question of whether we've at least generated a fact dispute on the issue of whether or not practicing the standard always requires practicing the claim. Really, the Gorsha White Papers get to the same issue that we cited in our brief when they explain... Was the discovery still open at the time of the summer judgment motion? No, Your Honor. So there was no opportunity for the experts to respond to the trial court's claim construction? That's correct, Your Honor. We had an unexpected claim construction that we received as part of the summary judgment ruling, and none of the experts really were able to weigh in on that construction. Okay. Go ahead. You're into your rebuttal. You want to save it? I'll save it. Thank you, Your Honor. Thank you. And I'll start with claim construction. The district court correctly construed the encoded information stream to mean a continuous series of encoded bits that is to be sent or received over the network, and that corresponds to its respective information group. Contrary to what the appellant stated, the court did not construe stream in isolation. The court gave the entire term limitation a construction that includes the encoded information part of that term. Do you agree with the district court that the specification is ambiguous on what this means? I agree with the district court that the specification does not provide an express definition of encoded information stream, and that it was appropriate at that point to say, what would a person of ordinary skill in the art at the time of the effective filing date have understood by the term stream? What's your response to the argument on the other side that what someone understands the word stream to mean doesn't mean much when you're just talking about a normal dictionary, when the real question is what is encoded information stream? I think the response to that is that there's no evidence from the appellant about what a person of ordinary skill in the art would have understood at the time of the effective filing date. Their declaration from Dr. Nettles, which is full of conclusory statements, and from a biased expert not subject to cross-examination, basically ticks off all of the warning labels that this court said in Phillips. Don't rely on expert testimony in those situations, but in that dictionary definitions from the time are unbiased and are helpful. And so when you look at those dictionary definitions, and then you come back to the specification, and you can see that the specification is consistent with those dictionary definitions. Well, what a skill in the art would have understood at the time is an underlying question of fact. And while you say Dr. Nettles' testimony wasn't strong enough or wasn't credible enough, why are those determinations that should be made at claim construction as opposed to by the jury? Because there's a question of fact as to what one would understand. But that is a question that the district court is able to resolve, and that deserves deference under TEVA. But it is a question of claims scope, and the district court probably took that up under O2 micro, realized that the parties had a dispute about what the term encoded information stream meant, looked at the specification, didn't see an express definition, went to neutral dictionary definitions from the effective filing date time period, and properly construed the claim and gave meaning to all elements of the claim term. Even if we get past the claim construction, I think my most difficult part about this case is the extent to which there seem to be findings of fact with respect to what the standard teaches and with respect to whether or not there isn't sufficient circumstantial evidence to raise a genuine material issue of fact. So the only evidence, if you will, that the appellant has is attorney argument regarding what the standard allegedly means in terms of 8-2 versus 8-3. And that argument, by the way, was raised at the last minute during the summary judgment briefing period in opposition to the defendant's motion for summary judgment. That's why there's no expert testimony in the record to support the appellant's theory. And all of the experts testified contrary to the appellant's attorney argument. All experts agreed that 8-2 is a logical, abstract representation that does not depict the generated signal, Appendix 28-29 and 38-39, including Sycamore's expert. At Appendix 785, he was asked this question, Does Figure 8-2 depict what is actually generated and sent over communications link? Answer, well, no, ma'am. This is showing the logical relationships that go into the transform. The Figure 8-3, which is the superblock, is closer to what is sent over the wire. And again, the white papers, as I understand it, discuss the ability to try to avoid latency once you've created one block, the 64-65. Isn't that creation of a block infringement? Or at least doesn't it raise a question of infringement? And, Your Honor, you're speaking about G.7041, and I think that's Appendix 378. 378. Yeah, it does not. And the reason it does not is because it's what is transmitted is the first 64-bit portion of that first 64-B, 65-B block. 8-3, everyone agrees that 8-3 instructs the implementer not to combine the flag bit with the 64-bit portion. So when the superblock is being generated, 64 bits by 64 bits by 64 bits for each respective information group, it's only after all of those 64 bits for each of the eight information groups are generated and transmitted that the flag bit or data indicator for each of those eight information groups is actually generated and then transmitted. So although it's commonly referred to as 64-B, 65-B, the 65-B doesn't come into play until the flag bit is set and generated. In the superblock, that doesn't happen until 448 bits after the end of the first 64-bit group is encoded and sent. And then the standard itself right there in the note below 8-3 says implementation is up to the implementer. You don't even have to generate the entire superblock structure before you start transmitting. You can just transmit. Did you present any evidence that anyone who practices this standard does it in the way that you're describing as opposed to the way that your friend on the other side is describing? We did. One example of that testimony is from a chipmaker. This is confidential business information, so I'm going to refer to it but not read the testimony. And that's at Appendix 870 where the chipmaker's witness says that 8-2 are possible codes, which was testimony consistent with all of the experts in the case, including Dr. Nettles, Sycamore's expert. And again at Appendix 872, in particular at page 60, line 17 through 22, that chipmaker is talking about the actual implementation and provisioning of the chips and says that 8-3 is the format of the payload structure that that particular chipmaker uses. And that testimony was undisputed and unrebutted, and that chipmaker was subject to cross-examination. Appellant had every opportunity to get different testimony from that chipmaker but didn't. In addition, you do have the testimony of the defendant's experts, Drs. Lanning and Schofield, that when making the decision how to implement the standard, one wouldn't implement 8-2 first because all that would do is add to increased latency, and the whole purpose of the GDOT 7041 standard is to transparently transcode in a way that reduces latency. It wouldn't make sense to first implement 8-2, then strip off the data indicator or flag bit for every one of those streams or 64-bit payloads, and then reconfigure them and send them out in a different format. There's also no testimony in the record about what it would mean to generate 8-2 internally first. And under the district court's claim construction, an encoded information stream is something, this continuous series of bits, that's actually generated, that's actually sent out over the wire, and that's part of the court's claim construction. Everyone agrees that 8-2 is not what's sent out over the wire. 8-3 or, according to Dr. Nettles, something like it is to be sent or received over the wire. In terms of the GORSHA white papers, the district court itself properly recognized that the white papers are themselves inconsistent with the GDOT 7041 standard, which says you don't need to wait for the entire superblock to begin transmitting. Implementation is up to the implementer. And there's another way of thinking about 8-2 versus 8-3, and I do want to get to the appellant's argument that the district court was somehow inconsistent in talking about figure 6 versus figure 8-2. But before I get to that, one can think of 8-2 as essentially like a foreign language dictionary. When you've got a French word in the input, that's fromage. It's going to be cheese in the output. But how you say that sentence that has those words, it's up to you. You can either start speaking as soon as you've translated the first word, this is 8-3, or you can wait until the whole sentence has been formulated in your mind and then speak it. But you don't have to translate the entire foreign language dictionary before you can start speaking the first sentence. And that's essentially what Dr. Nettles testified to. He said that 8-2 is just a schematic about the encoding. It is a map for how you do the encoding. And he says that it's Appendix 788 and Appendix 789-90. Now, turning to appellant's argument that the district court was somehow inconsistent or confused, figure 6 from the patent and figure 8-2 from the standard, while they are facially similar in appearance, have completely different functions. And all of the experts agreed about that. Figure 6 is an embodiment of one configuration of the actual code that's sent out over the network. Dr. Tseng agreed that that was what figure 6 was depicting. He said that it's the actual code generated and sent over the network, Appendix 2035 and 2149. Figure 8-2, as all the experts in this case agreed, is the code components. G.7041 itself refers to 8-2 as depicting the code components and says, go see figure 8-3 for the actual superblock. So the corollary within the standard to figure 6 is actually figure 8-3. It's not figure 8-2. And all of the experts agreed to that. Again, Appendix 20-29 and also Appendix 38-39 for the G.709 standard. One of the things that concerns me is that there just seem to be a lot of places here where the court was deciding whose evidence was better rather than just deciding that it didn't raise any genuine issue of fact. So the court said they were assuming the white papers were admissible and assuming the specification sheets were admissible and went ahead and so that leaves us in the position, despite your argument that they weren't admissible, because we can't make an evidentiary ruling in the first instance. So we have to assume they're admissible. And then he says things like about the specification sheets, well, they're ambiguous. I mean, they clearly show one methodology, but we can't tell whether they're excluding any other methodology. Why isn't that a quintessential question of fact? It's not because in this particular case the appellant, the plaintiff, decided to pursue a standards-based infringement theory under Fujitsu. And the only way, and this is a strategic decision. But Fujitsu doesn't say you have to, Fujitsu doesn't say that you have to disprove that anyone could have possibly done it any other way. And Fujitsu doesn't say that standard forms of proof like circumstantial evidence are meaningless. So it's not like they didn't submit proofs. Maybe they didn't prove it to what a juror would ultimately accept. But when we're talking about things like infringement, there is a lot of evidence that shows that this is how it's practiced. Under Fujitsu, this court issued a warning. Fujitsu said this is a permissible shortcut to proving infringement. I get that, and the other side doesn't dispute that it says you have to show that it's the only way to do it. Yes, the only possible way. But the question is what do you need to show that? You need to show that it's not impossible to do it some other way. And we have come up with expert testimony from not only the defendant's experts, but Sycamore's expert as well, that says you don't do 8-2, you go straight to 8-3. 8-2 is just a logical representation. You have to show that if the only thing you're going to rely upon is the standard. That's right. But now the court allowed in other evidence to indicate that it's actually being done a different way. So the court, I don't think, actually allowed in that evidence. At the summary judgment hearing... But we're stuck with that evidence, because the way the court said, I'm assuming for purposes of this summary judgment that it's admissible. So that is true, that the court did say that. But at the summary judgment hearing, Sycamore actually had to disclaim reliance on the vendor documents that I think, Judge O'Malley, you're speaking about, because they were lobbed in at the last minute after the record for summary judgment had closed. The district court asked for evidence about the reliability and admissibility of the white papers, but instead got all these vendor documents from Sycamore. So at the summary judgment hearing, the court said, I asked you for all those, you didn't give me anything about that. You gave me all these other vendor documents. And Sycamore said that it was not relying on the vendor documents to show how the defendant's equipment implements the standard. It said it was only relying on those documents to show that the white papers are consistent with the standard. But even if it's true that there are four examples of equipment out there somewhere that implement 8-2 first before they implement 8-3, that's still not enough. And I'll take the court back to Fujitsu. It's not enough for what? For this particular infringement case, because the plaintiff decided to pursue a standards-based only infringement case, which means they have to show that every possible implementation infringes. They did not pursue an equipment-based case. And Fujitsu, when it issued that warning, said, you know, it may be near impossible in some cases. That's okay, we know what it says. That's one case we all know. But when you run into that problem, which Sycamore ran into, had long, that they couldn't show that every possible implementation necessarily infringes, the next step for Fujitsu is go look at the defendant's equipment and do an analysis on the equipment to see if the defendants are actually implementing it that way. And in Fujitsu, not to repeat that, no warning, but the actual evidence in Fujitsu, the plaintiff decided, knew it had a problem with the standard because the standard didn't necessarily require it, so it went and looked at four implementations and found that in four instances, the products did implement the fragmentation part of the standard. So they proved direct infringement for those four. But for all of the other equipment, they were remaining with their standards-based infringement theory. And that's why summary judgment of non-infringement was affirmed by this court. We're in the same situation here. Okay, thank you. Are there any further questions on claim construction? Your time is up. Okay, thank you. Thank you. I think the dialogue with the court has made clear today there are disputed facts that go directly to the question of whether there's infringement, even under the court's erroneous claim construction. But, I mean, I get the frustration. You've got a patent, it's adopted as the standard, all these people say they're practicing the standard, and then all of a sudden you have a non-infringement argument. But didn't the court make it clear in Fujitsu that unless if you've got any ability to not practice it the way the patent claims it, then you can't just rely on the standard, you've got to go beyond it? So I think that we all agree when the rule of Fujitsu is that we would have the burden at trial to demonstrate that every implementation of the accused standard infringes the patent. That doesn't mean, though, if there's a fact dispute about whether or not that's true, that we automatically lose. But didn't Dr. Nettles actually say that you could, he said you wouldn't want to, but you could practice the standard this other way? No, he did not. And I think a review of his deposition testimony is warranted, and I'll just point out what I think are the salient pages. It's very clear on Appendix 785 and 790 that what Dr. Nettles is talking about is what actually goes out over the wire. And he explains that, as he did in his unrebutted declaration, that what actually goes out over the wire is in a frame that's been scrambled and so forth. In fact, he even says on page 786 that 8-3, the superblock, isn't necessarily sent out over the wire. But we don't have to show that's what's sent out over the wire to demonstrate infringement. What we have to show, under the erroneous claim construction, is that 8-2 is actually formed. And if you look at his testimony on page 792 of the appendix, he says you don't have to preserve the physical relationships we see in 8-2 in the serialized output, which is at least a suggestion that he recognizes that 8-2 is actually formed. And even if Paley's characterization of Dr. Nettles' testimony is accurate, that, at a minimum, creates a fact dispute when you have the actual standard saying that Figure 8-2, the code block, has to be formed. And my friend made the point that 8-2 is somehow different than Figure 6 because of the use of the word code. But code just proves the point. Code is this. Now I'm reverting back to the claim construction argument. Code is a logical relationship. So just like you could have Figure 8-2 be a logical relationship properly construed, so too Figure 6, which is referred to as a coding scheme in the description of Figure 6 in the patent. So the fundamental problem that we had here is that the district court's determination concerning claim construction and summary judgment just simply can't be reconciled. Regarding claim construction, the district court determined that Figure 6 requires physical contiguity in the encoded information stream. And yet for summary judgment, the district court determined that effectively the same figure is just a logical relationship. Both things can't be true. Either the claim construction is wrong because a person of ordinary skill would view both figures as depicting logical relationships as explained by Dr. Nettles, not rebutted by any expert on their side. No one came in to say that he was wrong about the privacy of logical relationships in this field. And the district court didn't make a credibility, adverse credibility determination. All he did was explain how things actually work in transcoding, and logical relationships are key. But on the other hand, if you're going to say that Figure 6 requires physical contiguity contrary to the teachings of the specification, then you can't interpret 8-2 differently than Figure 6 at a minimum. A reasonable jury could conclude that 8-2 has to be formed to practice the standard, and that's why, under the erroneous claim construction, the district court's grant of summary judgment was erroneous. We respectfully ask for reversal. Thank you. The cases will be submitted. This court is adjourned.